UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

United States of America

v.

Jose Rivera,

Defendant.

**SUPPLEMENTAL REPORT
AND RECOMMENDATION**
13-CR-83S

## I. INTRODUCTION

Defendant Jose Rivera ("Rivera") filed omnibus pretrial motions and affidavits as part of

his pretrial preparation in this case. (*See generally* Dkt. Nos. 91, 278, 290.) The motions included

motions to suppress statements that Rivera made at his residence at 1517 Ashland Avenue in

Niagara Falls, New York ("Ashland"). Among other reasons, Rivera wanted the statements

suppressed on Fifth and Sixth Amendment grounds, and because the search warrant for Ashland

contained one listing, among other correct listings, of an incorrect address. The Court issued a

Report and Recommendation addressing Rivera's motions (Dkt. No. 313) without specifically

addressing the arguments named above. The Report and Recommendation has since been

adopted. (Dkt. No. 350.)

Rivera now has filed a motion (Dkt. No. 353) for a revised or supplemental Report and

Recommendation that specifically addresses the arguments named above. The Government duly

filed opposition papers (Dkt. No. 363), and the Court has considered the motion submitted on

papers. As a procedural matter, the Court agrees with Rivera that he should receive a specific

analysis of the arguments that he has identified, if only to preserve his arguments for possible

appeal. The Court grants Rivera's motion for revision to this limited extent; this Supplemental

Report and Recommendation issues accordingly.  The Court respectfully recommends denying

Rivera's motion for revision in all other respects and leaving the previously adopted Report and

Recommendation undisturbed.

II.   **BACKGROUND**

The Court will presume familiarity with the facts of the case, as developed in the docket

generally and in the Report and Recommendation.  The Court will focus here on those facts that

pertain directly to Rivera's motion for revision.

### A.  Search Warrant

On or around April 5, 2013, the Clerk of the Court issued an arrest warrant for Rivera

following his indictment.  Meanwhile, law enforcement agents developed information indicating

that Rivera resided at Ashland.  Upon application from the Government, this Court issued a

search warrant for Ashland.  (*See generally* Case No. 13-MJ-2079.)  Although officially titled a search

warrant for a premises, the search warrant was limited to entering Ashland to seize Rivera.  In fact,

the executed warrant shows no inventory and notes only that Rivera was arrested.  (Dkt. No. 144-1

at 2.)  Of concern to Rivera is the discrepancy in address that appears on the face of the search

warrant.  The caption for the warrant reads, "In the Matter of the Search of 1517 Ashland Avenue,

Niagara Falls, New York." (*Id.* at 1.)  The first two substantive paragraphs on the face of the search

warrant also describe Ashland.  Nonetheless, the last paragraph authorizing no-knock entry

inexplicably lists a different address: 45 Millicent Avenue, Buffalo, New York.  Given the first

three mentions of Ashland on the face of the search warrant, the Court must have overlooked the

listing of a different address at the bottom of the page.

Rivera now challenges the validity of the warrant because of the discrepancy.  Specifically, "[t]he warrant is facially defective in that it authorizes the no-knock entry of the premises at 45 Millicent Avenue, Buffalo, New York." (Dkt. No. 278 at 8.)  The Government responds in two ways.  Legally, the Government cites to *Hudson v. Michigan*, 547 U.S. 586 (2006), for the proposition that the exclusionary rule does not apply to unlawful no-knock entries.  Factually, the Government notes that a no-knock entry did not actually happen; "the agents in fact knocked at the door to the point of damaging it and taking nearly fifteen minutes to gain entry." (Dkt. No. 363 at 2.)  The testimony from the hearing conflicted somewhat on this point.  Law enforcement agents testified that entering Ashland took as long as 10 or 15 minutes, implying that they did knock without using force.  (*See* Dkt. No. 209 at 22.)  Rivera's girlfriend, Carmen Ortiz ("Ortiz"), testified that agents broke the front door to enter.  (*Id.* at 62, 69.)

### B.  *Fifth and Sixth Amendment*

Agents executed the search warrant for Ashland on the morning of April 10, 2013.  Agents entered Ashland around 6:15 AM that morning; Rivera was in custody by about 6:30 AM.  Agents handcuffed Rivera and brought him to the kitchen of the house.  When Rivera asked for a chance to change clothes from his pajamas, the agents removed the handcuffs and let him change into jeans and a sweatshirt.

Rivera's Fifth Amendment challenge concerns the next part of his interaction with the agents.  The agents conversed with Rivera in Spanish because he indicated that he preferred Spanish and knew how to read and write in Spanish.  One of the agents testified that Rivera "wanted to know what was going on and I advised him that first let me read his Miranda rights and then we'll let him know we showed up with a warrant and what was going on with the case,

why we were at his location." (Dkt. No. 150 at 63.)  Agents then furnished Rivera with an FD-395

form, a *Miranda* rights form in Spanish.  Once Rivera confirmed that he understood his rights,

one of the agents "showed him a copy of the warrant, the arrest warrant for him for the conspiracy

of narcotics through the FBI Immigration and Customs Enforcement, and asked him if he wanted

to talk about it, and he said, 'no, I don't want to talk about that.'  So he did not make any more

further comments about the investigation.  I told him that there was a wiretap investigation going

on through the FBI that I currently worked.  I worked that wire and that he was heard on

conversations and there was some intercepted with him involved and he stated he didn't want to

talk about any of that stuff." (*Id.* at 70.)  Around the same time, Ortiz signed a voluntary consent

for a search of Ashland, and a search of the house began.  Agents asked Rivera whether there were

any weapons in the residence; Rivera denied the presence of any weapons but acknowledged the

presence of a magazine in a room of the house that had been set up as an office.  (*Id.* at 76.)  One

of the agents then had one more lengthy exchange with Rivera:

> I stayed and talked to Mr. Rivera for a while.  I also asked him about, as I testified, I
> advised him there was a wiretap with one of the subjects that he identified in the
> picture as Mr. Quinones, and he stated that there was a conversation that took
> place, he was also known as "Shorty."  And I asked him why he was called "Shorty."
> And he stated they call him "Shorty," but it's a nickname and he didn't give a
> reason why.  And I asked him if he recalled a conversation that he had with Mr.
> Quinones about one of the other defendants by the name—well, he described as
> "Hulk."  And I asked him what was the conversation.  And he stated that he and
> there was another gentleman, another defendant by Hosalito that was part of that,
> he also identified out of the pictures that we showed him, that Hosalito and he had
> a problem because Hosalito thought that Mr. Rivera was trying to rob him or he
> got robbed, and so there was a conflict, and that he called Quinones because he
> heard that Hulk was looking for him and he just wanted to clear the air.  And he
> stated he did have that conversation, he just wanted to know what was going on
> with why was Hulk looking for the defendant, Mr. Rivera.

(*Id.* at 77–78.)  The interactions with Rivera concluded with a discussion of some money found in

a bag and a confirmation that there was no "trap" or hidden compartment in one of the vehicles searched on the premises. (*Id.* at 78–79.)

On the basis of the conversations summarized and quoted above, Rivera argues that his Fifth and Sixth Amendment rights were violated. With respect to the Fifth Amendment, Rivera argues that he invoked his right to remain silent the first time when he told the agents, "No, I don't want to talk about that." "Obviously, the fact that Colon [*i.e.*, one of the agents] persisted in asking questions after Mr. Rivera clearly indicated he did not wish to talk about the alleged conspiracy or the intercepted communications would indicate to Mr. Rivera that none of his answers as to those questions would ever be admissible against him in the conspiracy prosecution. Unquestionably, he was misled into believing that his answers would not be utilized against him due to Colon's Miranda violation in failing to abide by Mr. Rivera's statement that he did not wish to discuss the conspiracy or the intercepted communication." (Dkt. No. 278 at 18.) With respect to the Sixth Amendment, Rivera asserts "that there was a plan to deliberately elicit statements from Mr. Rivera in violation of his right to counsel" (*id.*) given that he already had been indicted by April 10, 2013, the date of the search of Ashland. The Government responds to both arguments that Rivera understood his rights when reviewing them with law enforcement agents, and that he did not make a sufficiently clear invocation of his right to remain silent. "Having made neither an invocation of his right to remain silent nor an assertion of any right to counsel, the defendant's full comprehension, acknowledgment and signature on the Spanish advice of rights form dispel each of the defendant's claims." (Dkt. No. 363 at 4.)

## III.    DISCUSSION

### A. *Search Warrant for 1517 Ashland Avenue—Unrelated Address*

"The uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional." *Massachusetts v. Sheppard*, 468 U.S. 981, 988 n.5 (1984) (citations omitted). The appropriate particularity of a place to be searched or a thing to be seized must appear on the face of the warrant, either directly or by way of an explicit incorporation of a document attached to the warrant. *See Groh v. Ramirez*, 540 U.S. 551, 557–58 (2004) (citations omitted). That said, "[a] search warrant is not invalid where the place to be searched is described with sufficient particularity to enable the executing officer to locate and identify the premises with reasonable effort, and where there is no reasonable probability that another premises might be mistakenly searched." *U.S. v. Garza*, 980 F.2d 546, 551 (9th Cir. 1992) (internal quotation and editorial marks and citations omitted). "[M]inor clerical errors generally are not fatal to a search warrant." *U.S. v. Waker*, 534 F.3d 168, 172 (2d Cir. 2008) (citations omitted).

Here, the error that appears on the face of the search warrant for Ashland is a clerical error that caused Rivera no prejudice. The last paragraph of the warrant itself does indeed list the incorrect address of 45 Millicent Avenue, Buffalo, New York. That address is so different from the Ashland address that the Court infers that the Government prepared the warrant from a previously existing warrant and forgot to change the address in one place. Had a no-knock entry of 45 Millicent Avenue actually occurred based on the search warrant alone, any evidence seized or statements taken would have been flagrantly improper as without any basis. No such entry occurred, though. Meanwhile, the correct Ashland address does appear three times on the face of

6

the warrant.  The accompanying application for the search warrant (Case No. 13-MJ-2079, Dkt.

No. 1) listed and described the correct Ashland address every time.  *Cf. U.S. v. Ventresca*, 380 U.S.

102, 109 (1965) ("[W]here these circumstances are detailed, where reason for crediting the source

of the information is given, and when a magistrate has found probable cause, the courts should

not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a

commonsense, manner.").  Whether the agents entered with or without knocking, the warrant can

be understood to have authorized no-knock entry into Ashland.  The agents wound up entering

the correct Ashland address.  Rivera has not presented any issue pertaining to a lack of specificity

of items to be seized, making this case different than *Groh* or *U.S. v. Rosa*, 626 F.3d 56 (2d Cir.

2010).  Without some showing that the erroneous listing of 45 Millicent Avenue altered the

probable-cause analysis, misdirected the agents, or otherwise caused Rivera some kind of prejudice,

the Court is inclined to disregard the listing as an unfortunate but harmless discrepancy.

### B.  *Suppression of Statements—Fifth Amendment Grounds*

"Without the right to cut off questioning, the setting of in-custody interrogation operates

on the individual to overcome free choice in producing a statement after the privilege has been

once invoked.  If the individual states that he wants an attorney, the interrogation must cease until

an attorney is present." *Miranda v. Arizona*, 384 U.S. 436, 474 (1966).  "Likewise, if the individual

is alone and indicates in any manner that he does not wish to be interrogated, the police may not

question him.  The mere fact that he may have answered some questions or volunteered some

statements on his own does not deprive him of the right to refrain from answering any further

inquiries until he has consulted with an attorney and thereafter consents to be questioned." *Id.* at

445.  The invocation of the right to remain silent must be unambiguous; if it is then the defendant

cuts off all questioning about that offense. *See Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010)

(citation omitted).  Cutting off questioning does not forbid law enforcement agents from returning

to defendants, presenting *Miranda* rights again, and attempting to question them about unrelated

offenses. *Compare Michigan v. Mosley*, 423 U.S. 96, 106 (1975) (affirming admission of statements

where law enforcement agents "immediately ceased the [first] interrogation, resumed questioning

only after the passage of a significant period of time and the provision of a fresh set of warnings,

and restricted the second interrogation to a crime that had not been a subject of the earlier

interrogation.") *with U.S. v. Hernandez*, 574 F.2d 1362, 1369 (5th Cir. 1978) ("After Hernandez

arrived at the station house he was advised of his Miranda rights.  He declined to answer

questions.  Almost immediately thereafter the police made a second effort to interrogate

Hernandez.  Clearly, the police did not immediately cease the interrogation nor did they resume

questioning after the passage of a significant period of time.  Their acts were immediate, repetitive,

and deliberate. The police focused their interest on only the crime involving the marijuana.  They

made absolutely no indication of a desire to restrict subsequent interrogation to crimes other than

that which was the subject of the earlier attempted interrogation.").

The exact level of clarity required in an invocation of the right to remain silent is itself not

quite clear and not subject to formula.  Generic statements such as "I have nothing to do with

anything else," *Gandia v. Hoke*, 648 F. Supp. 1425, 1431 (E.D.N.Y. 1986), or "I'm not going to talk

about nothin'," *U.S. v. Sherrod*, 445 F.3d 980, 982 (7th Cir. 2006); or statements indicating that

defendants "are not ready to talk at that time" or want to "sleep on it," *see U.S. v. Al-Muqsit*, 191

F.3d 928, 936–37 (8th Cir. 1999), *vacated in part on other grounds on reh'g en banc sub nom. U.S. v.*

*Logan*, 210 F.3d 820 (8th Cir. 2000), appear not to suffice because they do not relate to a specific investigation, case, or offense. In contrast, a statement like "I got nothing to say" sometimes can be enough to invoke the right. *See State v. Fletcher*, 500 S.E.2d 668, 677 (N.C. 1998). Additionally, "responding to some questions while not responding to others" does not constitute an invocation of the right to remain silent. *U.S. v. Jarvis*, 237 F. App'x 636, 639 (2d Cir. 2007) (summary order); *see also Bradley v. Meachum*, 918 F.2d 338, 342 (2d Cir. 1990) (denying a habeas corpus petition where the petitioner "initially stated that he did not wish to discuss his involvement in the crime but immediately denied any connection to the robbery and proffered an explanation of his whereabouts at the time of the crime. We do not view this conduct as an invocation of the right to remain silent.").

Here, Rivera fell short of an unambiguous invocation of the right to remain silent. During the events surrounding his arrest at Ashland, Rivera twice said "I don't want to talk about that" or "I don't want to talk about any of that stuff" with respect to the occurrence or the content of any intercepted telephone conversations. Had Rivera stopped there, the clarity of his invocation would have been a very close call and might have required suppression of the statements. Rivera, however, went on to provide information about the magazine in his office, his nickname, and the presence or absence of any hidden compartments in vehicles on the premises. *Cf. U.S. v. Ramirez*, 79 F.3d 298, 305 (2d Cir. 1996) ("Ramirez's nonresponse to two questions, having answered others, did not require the cessation of questioning since his silence certainly did not constitute a 'clear' request that all further questioning cease.") (editorial marks omitted). Rivera's decision to provide this information is important because it indicates that Rivera had enough understanding

9

of his rights to feel comfortable providing law enforcement agents with selective information. The statements that Rivera made do not appear to relate directly to the substance of any wiretapped conversations—or at least, Rivera seems to have made his own judgment call to that effect. Rivera provided information that he seems to have considered peripheral or background information. If Rivera had been overwhelmed by the interrogation then he probably would not have been able to maintain that distinction. These circumstances together weigh against suppression.

The case law that Rivera has cited does not change the above analysis. In *U.S. v. Montana*, 958 F.2d 516 (2d Cir. 1992), the Second Circuit found that a defendant invoked his right to remain silent "simply by remaining silent during pedigree questioning." *Id.* at 518. Rivera did not simply remain silent, which makes *Montana* factually different; additionally, the holding from *Montana* might be questionable following *Berghuis*. *See Berghuis*, 560 U.S. 370, 375 (finding no invocation where the defendant was "largely silent" for the first two hours and 45 minutes of a three-hour interrogation); *see id.* at 382 ("Thompkins did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked his right to cut off questioning.") (internal quotation marks and citations omitted).

### C. Suppression of Statements—Sixth Amendment Grounds

Finally, the Court will assess Rivera's Sixth Amendment argument to suppress statements that he may have made during the search of Ashland. "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. "The Sixth Amendment guarantees the accused, at least after the initiation of formal charges,

the right to rely on counsel as a 'medium' between him and the State.  As noted above, this guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right.  The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation." *Maine v. Moulton*, 474 U.S. 159, 176 (1985).  "Whatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Brewer v. Williams*, 430 U.S. 387, 398 (1977) (internal quotation marks and citations omitted).  "[O]nce adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him."  *Id.* at 401; *see also U.S. v. Rommy*, 506 F.3d 108, 135 (2d Cir. 2007) ("Once the right attaches, the Sixth Amendment renders inadmissible in the prosecution's case in chief statements deliberately elicited from a defendant without an express waiver of the right to counsel . . . . [D]eliberate elicitation under the Sixth Amendment covers only those statements obtained as a result of an intentional effort on the part of government officials to secure incriminating statements from the accused.") (internal quotation marks and citations omitted).

A long line of Supreme Court cases has developed when the Sixth Amendment right attaches.  In *Massiah v. U.S.*, 377 U.S. 201 (1964), the defendant "was indicted for violating the federal narcotics laws.  He retained a lawyer, pleaded not guilty, and was released on bail.  While he was free on bail a federal agent succeeded by surreptitious means in listening to incriminating

statements made by him." *Id.* at 201.  By the time the defendant came under surveillance, then, he

already retained counsel and went through arraignment.  Those events pushed the Supreme Court

to suppress the statements and to "hold that the petitioner was denied the basic protections of that

guarantee when there was used against him at his trial evidence of his own incriminating words,

which federal agents had deliberately elicited from him after he had been indicted and in the

absence of his counsel." *Id.* at 206.  In *Kirby v. Illinois*, 406 U.S. 682 (1972), the Supreme Court

reviewed a number of its prior cases and noted that "while members of the Court have differed as

to existence of the right to counsel in the contexts of some of the above cases, all of those cases

have involved points of time at or after the initiation of adversary judicial criminal proceedings."

*Id.* at 689.  *Brewer* further helped locate the point of Sixth Amendment attachment at arraignment

or some similar commencement of adversarial proceedings in court.  In *Brewer*, the defendant did

not have counsel actually appointed[1] at the time of the solicitation of statements, but he had been

arraigned.  The occurrence of the arraignment was enough for the Supreme Court to affirm the

granting of a habeas corpus petition.  "[T]he clear rule of Massiah is that once adversary

proceedings have commenced against an individual, he has a right to legal representation when the

government interrogates him." *Brewer*, 430 U.S. at 401.  In *U.S. v. Gouveia*, 467 U.S. 180 (1984),

the Supreme Court added the explicit distinction between arrest and arraignment.  "Our speedy

trial cases hold that that Sixth Amendment right may attach before an indictment and as early as

the time of 'arrest and holding to answer a criminal charge,' but we have never held that the right

to counsel attaches at the time of arrest.  This difference is readily explainable, given the fact that

---

[1] Rivera has not attempted to litigate any difference between the attachment of the Sixth Amendment right and the practical obligation to appoint counsel at a specific time. *See generally, e.g., Rothgery v. Gillespie Cty.*, 554 U.S. 191, 214–17 (2008) (Alito, *J.*, concurring).

the speedy trial right and the right to counsel protect different interests.  While the right to

counsel exists to protect the accused during trial-type confrontations with the prosecutor, the

speedy trial right exists primarily to protect an individual's liberty interest, to minimize the

possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial,

impairment of liberty imposed on an accused while released on bail, and to shorten the disruption

of life caused by arrest and the presence of unresolved criminal charges." *Id.* at 190 (internal

quotation marks and citations omitted).  The Supreme Court used *Rothgery v. Gillespie Cty.*, 554

U.S. 191 (2008), to affirm again "that the right to counsel guaranteed by the Sixth Amendment

applies at the first appearance before a judicial officer," *id.* at 194, and to clarify that the adversarial

presence at the appearance can come from either a prosecutor or a police officer.

Against the long line of cases cited above, two Supreme Court cases stand out.  One

appears to be fairly easy to explain.  In *Escobedo v. Illinois*, 378 U.S. 478 (1964), the petitioner

already had retained counsel when he was arrested and brought in for police interrogation.

Retained counsel went to the police station and wanted to see his client; his client wanted to see

his attorney.  "At one point, as previously noted, petitioner and his attorney came into each

other's view for a few moments but the attorney was quickly ushered away." *Id.* at 481.  The

Supreme Court ultimately suppressed any statements made during the interrogation.  The

Supreme Court cited *Massiah* and noted that the petitioner had not been indicted yet, but it felt

the need to adapt *Massiah* to the unusual circumstances of the interrogation.  "The interrogation

here was conducted before petitioner was formally indicted.  But in the context of this case, that

fact should make no difference.  When petitioner requested, and was denied, an opportunity to

consult with his lawyer, the investigation had ceased to be a general investigation of an unsolved

crime.  Petitioner had become the accused, and the purpose of the interrogation was to 'get him'

to confess his guilt despite his constitutional right not to do so."  *Id.* at 485 (internal quotation

marks and citation omitted).  *Escobedo* thus can be distinguished by its facts, facts not present in

Rivera's case.  *See also Kirby*, 406 U.S. at 689 ("Secondly, and perhaps even more important for

purely practical purposes, the Court has limited the holding of *Escobedo* to its own facts, and those

facts are not remotely akin to the facts of the case before us.") (citation omitted).  The other case,

cited by Rivera in his motion, is more confusing, probably because of a lack of factual

development.  In *Fellers v. U.S.*, 540 U.S. 519 (2004), the defendant was indicted for conspiracy to

distribute methamphetamine.  Police arrested the defendant after the indictment and interrogated

him in jail.  The Supreme Court ultimately found a Sixth Amendment violation because "the

ensuing discussion took place after petitioner had been indicted, outside the presence of counsel,

and in the absence of any waiver of petitioner's Sixth Amendment rights."  *Id.* at 524.  *Fellers*

explicitly follows the line of cases cited above, but confusion arises because neither the Supreme

Court decision nor the appellate decision below clarify when the defendant retained counsel.

Rivera tries to take advantage of this confusion by citing *Fellers* as if it expanded the Sixth

Amendment doctrine beyond what the other cases established.  At least one other court has

acknowledged the confusion that *Fellers* created.  *See U.S. v. Acosta*, 807 F. Supp. 2d 1154, 1186

(N.D. Ga. 2011) (noting "the apparent conflict in the Supreme Court's decisions" concerning

Sixth Amendment attachment).  This Court has tried to clarify the facts of *Fellers* by checking the

original district court docket sheet (*see* Appendix).  The district court docket sheet reveals only that

the defendant in *Fellers* was indicted on February 23, 2000 and retained counsel no later than

February 25, 2000.  Without better factual guidance, the best that this Court can do is to infer

that the defendant in *Fellers* did in fact have counsel at the time of his interrogation.  The Court

makes this inference based on the Supreme Court's citation to prior precedent without any

announcement of a change or expansion; and based on the Supreme Court's brief description that

the defendant's interrogation occurred "outside the presence of counsel."  The Court thus

concludes that the line of cases cited above still stands for the principle that, barring very unusual

situations like the one in *Escobedo*, the Sixth Amendment right to counsel attaches at the first

adversarial proceeding before a judicial officer, whatever the exact form of that proceeding might

be.

 Clarifying the starting point of Sixth Amendment attachment is important here because

the chronology of events undermines Rivera's argument.  Rivera was indicted on April 5, 2013

with what had been a sealed indictment.  (Dkt. No. 10.)  The execution of the search warrant for

Ashland occurred in the six o'clock hour the morning of April 10, 2013, as did the roundup of the

other defendants in the case.  Court audio records indicate that the indictment was unsealed at

approximately 11:24 AM in the courtroom on April 10, 2013, with arraignments beginning

immediately for the defendants arrested that day.  Rivera's arraignment began at approximately

11:47 AM, and his counsel was assigned under the Criminal Justice Act at approximately 11:52

AM.  By an admittedly close margin of about five to six hours, then, Rivera's Sixth Amendment

rights would not have attached as of the time of his interrogation.  Nothing in the record indicates

that any interrogation or conversation at Ashland was so unusual that the Court should try to fit it under *Escobedo*. Rivera's Sixth Amendment argument thus fails.

## IV. CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends denying Rivera's motion for revision (Dkt. No. 353) except to admit this Supplemental Report and Recommendation into the record to preserve Rivera's arguments.

## V. OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below. Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days. *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59. "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

__/s Hugh B. Scott_____
HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: May 17, 2016